UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JAMES ROSENCRANZ,    )
    )
    Plaintiff,    )
    v.    )    CIVIL ACTION
    )    NO. 14-13050-JGD
JAMES A. FREEMAN,    )
    )
    Defendant.    )

## MEMORANDUM OF DECISION AND ORDER
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

March 31, 2017

DEIN, U.S.M.J.

## I.  INTRODUCTION

This action arises out of the arrest of the plaintiff, James Rosencranz ("Rosencranz"), on

July 23, 2011 in front of Rosencranz's home in Winthrop, Massachusetts.  The plaintiff claims

that the arresting officer, James A. Freeman ("Freeman"), not only lacked probable cause for

the arrest, but also used excessive force by "chest bumping" the plaintiff, pushing him, and

slamming him into a neighbor's car.  By his Complaint in this action, Rosencranz has asserted

claims against Freeman, pursuant to 42 U.S.C. § 1983 ("Section 1983") and the Massachusetts

Civil Rights Act, Mass. Gen. Laws ch. 12, §§ 11H and 11I ("MCRA"), for false arrest and

excessive force (Counts I and II).[1]  He has also asserted claims against Freeman for false

---

[1] In addition to his claims for false arrest and excessive force, Rosencranz brought a malicious
prosecution claim against Freeman under Section 1983 and the MCRA.  However, on March 25, 2015,
this court dismissed those claims without prejudice.  (Docket No. 22).

imprisonment (Count III), assault and battery (Count IV) and intentional infliction of emotional distress (Count V).

The matter is presently before the court on "Defendant James Freeman's Motion for Summary Judgment" (Docket No. 92), by which Freeman is seeking summary judgment on all of Rosencranz's claims.  It is also before the court on Rosencranz's "Cross-Motion for Summary Judgment" (Docket No. 99), by which the plaintiff argues that he is entitled to summary judgment with respect to all Counts of the Complaint because there is no genuine dispute that "the defendant attacked and arrested the plaintiff without probable cause and has no real and lawful defenses to this action."  As described below, this court finds that Freeman is entitled to judgment as a matter of law with respect to Rosencranz's claim for intentional infliction of emotional distress, but that disputed issues of material fact preclude summary judgment for either party on any of the remaining claims.  Therefore, and for all the reasons detailed herein, the defendant's motion for summary judgment is ALLOWED IN PART and DENIED IN PART, and the plaintiff's cross-motion for summary judgment is DENIED.

## II.  STATEMENT OF FACTS[2]

The following facts, which are relevant to the parties' cross-motions for summary judgment, are undisputed unless otherwise indicated.

---

[2] Unless otherwise indicated, the facts are derived from the following materials: (1) Defendant James Freeman's Concise Statement of Undisputed Material Facts in Support of Summary Judgment ("DF") (Docket No. 94) and the exhibits attached thereto ("Def. Ex. __"); and (2) the Plaintiff's Concise Statement of the Material Facts of Record ("PF") (Docket No. 97) and Exhibit A attached thereto ("Pl. Ex. A").

## The Parties

The plaintiff, Rosencranz, is a resident of Winthrop, Massachusetts.  (See Def. Ex. A at 54).  He is also an attorney who has been practicing law in the Commonwealth for over thirty-two years.  (Compl. (Docket No. 1) ¶ 9).  The defendant, Freeman, is an officer in the Winthrop Police Department, and was acting in his capacity as a police officer at all times relevant to this action.  (Id. ¶ 7).  As described above, this case arises out of Freeman's arrest of the plaintiff on July 23, 2011.

## Plaintiff's Initial Interactions with the Winthrop Police

On the day of the events at issue, Rosencranz learned that his neighbor, Osman Nil ("Nil"), had been accused of domestic violence by his estranged wife, and had come to his house seeking legal advice.  (See DF ¶ 1; PF ¶ 3; Def. Ex. A at 19-20).  Although Rosencranz was not home at the time, his wife, Banafsheh Ehteman ("Ehteman"), was at the house when Nil arrived.  (Def. Ex. A at 19-20).  Ehteman called Rosencranz on her cell phone, and handed her phone to Nil so he could explain the situation.  (Id.).  The plaintiff spoke briefly to Nil, but then had to hang up the phone.  (Id. at 20).  When Rosencranz called back a few minutes later, he learned that officers from the Winthrop Police Department had arrived and were attempting to arrest Nil in the plaintiff's driveway.  (Id.).  Ehteman, who was watching the events unfold, told the officers that Nil's attorney was on the phone, and tried to hand Nil the phone.  (Id. at 20-21).  However, the officers yelled at Ehteman and refused to allow Rosencranz to speak with Nil.  (Id.).  Nil was then arrested and taken to the Winthrop police station.  (DF ¶ 4).

After the arrest, Rosencranz called the police station seeking information regarding Nil's case, and spoke to an officer named Sergeant Hickey.  (DF ¶¶ 5-6).  Rosencranz tried to

explain that he was representing Nil, but Sergeant Hickey refused to give him any information. (DF ¶¶ 6-7).  According to the plaintiff, Sergeant Hickey was "rude, arrogant, abrupt, brusque," and hung up the phone on him.  (DF ¶ 9; Def. Ex. A at 22).

Subsequently, Rosencranz went to the police station where he identified himself as Nil's attorney and spoke to an officer named Lieutenant Perrin ("Perrin").  (DF ¶¶ 10-11).  During his initial conversation with Perrin, Rosencranz told the Lieutenant that he wanted to speak to the bail commissioner when the commissioner arrived at the police station in order to address the matter of Nil's bail.  (DF ¶ 22; PF ¶ 7).  Additionally, Perrin informed Rosencranz that the police were applying for a warrant to search Nil's home and motor vehicle.  (DF ¶ 11).  Rosencranz then asked to speak with Nil, but Perrin told him there was no place available where they could talk.  (DF ¶ 12).  The plaintiff informed Perrin that Nil had a constitutional right to speak with his attorney, and Perrin suggested that Rosencranz speak with his client while Nil remained in his cell.  (DF ¶¶13-14; PF ¶ 4).  Although Rosencranz accepted Perrin's suggestion, he found it impossible to communicate confidentially with his client through the plexiglass covering Nil's cell.  (DF ¶ 15; PF ¶ 5; Def. Ex. A at 27).  Accordingly, the plaintiff proceeded to press Perrin for permission to enter Nil's cell or to speak with Nil in one of the offices located in the police station, but Perrin refused to accommodate the plaintiff's request. (DF ¶¶ 16-18; PF ¶ 5).

Thereafter, Nil informed Rosencranz that he had decided to consent to a search of his home and motor vehicle.  (DF ¶ 19; PF ¶ 6).  However, when Rosencranz told Perrin about Nil's decision, Perrin stated that he was going to apply for a search warrant anyway.  (DF ¶ 20). While there is no evidence indicating why Perrin decided to pursue the warrant, it is clear from

4

the record that Rosencranz viewed Perrin's statement, and his treatment toward the plaintiff in general, as hostile.  (See PF ¶ 6).

Rosencranz decided that he would try to get Nil out on bail, and he asked Perrin if he had heard from the bail commissioner.  (Def. Ex. A at 35).  Perrin told the plaintiff that he was still waiting for the bail commissioner to call.  (Id.). Rosencranz replied that he was going to wait, and he asked Perrin to let him know when the bail commissioner was going to arrive.  (Id. at 35-36).  After waiting for about forty minutes, the plaintiff again went to ask about the bail commissioner's arrival.  (DF ¶ 23).  This time, Perrin told Rosencranz that bail had been set over the phone for $10,000 cash.  (DF ¶ 24).  Rosencranz responded by telling Perrin, "first you won't let me speak to my client confidentially which is his constitutional right and then you deny him another constitutional right and a statutory right [to address] the bail commissioner on the issue of bail."  (Def. Ex. A at 36).  Although Rosencranz persisted in his effort to speak with the bail commissioner over the telephone, Perrin refused to cooperate and Rosencranz was ultimately forced to leave Nil in police custody.  (Id. at 37-40).

### Circumstances Surrounding the Plaintiff's Arrest

Following the events at the police station, Rosencranz returned to his home in Winthrop where he began to get ready for guests to come over by cleaning up his yard.  (DF ¶ 31).  While he was outside, Rosencranz observed a police cruiser outside Nil's home, and walked over to introduce himself to the officer inside the car.  (Def. Ex. A at 63-64).  After explaining that he was the attorney for Nil, Rosencranz asked the officer, Shawn McCarthy, if the police had obtained a search warrant yet.  (Id. at 64).  Officer McCarthy replied that he had no information regarding the warrant, and that he was only responsible for keeping an eye on

Nil's house.  (Id.).  The plaintiff handed Officer McCarthy his card and asked him to call when the police obtained the search warrant.  (Id.).  Officer McCarthy explained, in essence, that he had no involvement with the warrant, and that Rosencranz would need to ask Perrin about it. (Id.).  Rosencranz has described his interaction with Officer McCarthy as "pleasant," as well as "professional and courteous," and there is no dispute that the plaintiff returned to his home without incident.  (See id. at 65).

Several hours later, at around 7:00 in the evening, Rosencranz went outside again.  (DF ¶ 37; PF ¶ 17).  He noticed that Officer McCarthy was still parked in the vicinity, and that Freeman and a third officer were approaching Nil's parked car.  (DF ¶ 37; Def. Ex. A at 60). Rosencranz approached the officers and asked them whether a search warrant had been issued.  (DF ¶ 38).  Raising his voice, Freeman responded, "You know what the story is. You spoke with Lieutenant Perrin earlier."  (DF ¶ 39).  Rosencranz explained that he had spoken to Perrin earlier that day, and was aware that Perrin had applied for a search warrant, but that he was trying to find out whether a warrant had been issued.  (Def. Ex. C at Ans. No. 15). Freeman replied by screaming, "No, we don't have one."  (Id.).

Despite the defendant's apparent hostility, Rosencranz attempted to continue the conversation.  (PF ¶¶ 29-30).  Thus, Rosencranz indicated that he understood the situation. (See Def. Ex. C at Ans. 15).  He also attempted to hand Freeman his business card, and asked the defendant to call him once he had obtained a search warrant.  (Id.).  At that point, the defendant raised his voice even louder, screaming "I don't have to call you."  (Id.).  Rosencranz agreed that Freeman had no obligation to call him, but suggested that he should do so as a matter of professional courtesy.  (Id.).  The plaintiff also asked Freeman, "Why are you yelling .

. . all the time?  Am I yelling at you?  Did I raise my voice to you?  Who are you screaming at?"

(DF ¶ 43).  He further asked Freeman, "Why can't you act professionally . . . .?  "What is this,

Mayberry?" (Id.).

At this point, Rosencranz stopped talking and turned away from the officers.  (Def. Ex.

A at 68-69).  He then spotted two beer bottles lying beneath the hedge that ran along the

border of his property.  (Id.).  As Rosencranz later described during a hearing in Boston

Municipal Court:

> I went over and I picked [the bottles] up.  And I put them down, held them
> like this with the necks down.  And I walked away from [Freeman].  And
> then as I got about 10 to 15 feet away from him, I heard cluck, cluck, cluck.
> And I looked down and it was — there was little drops.  So I looked back and
> there was this semi circle, for lack of a better word, or trail.  And it wasn't
> that close to [Freeman] because I hadn't really been close to him when I
> came by him but, you know, I said, I looked and I didn't see anything on him
> but I turned around I said, I'm — "Did I get anything on you?  I don't see
> any, but if I did, I'm sorry."

(Def. Ex. B at 47-48).  It is Freeman's position that Rosencranz poured beer on his feet, and

that he asked the plaintiff what he was doing.  (Pl. Ex. A at 56-57 of 99).  He further contends

that he became very agitated "because the beer had been poured on [his] feet."  (Id. at 57 of

99).  However, Rosencranz claims that any liquid that came out of the bottles spilled onto the

ground, and that he was not even close enough to Freeman to have poured any beer on him.

(PF ¶ 38).

It is undisputed that after Rosencranz apologized, Freeman looked up at him and

screamed, "you mother fucking asshole."  (Def. Ex. A at 80-81).  According to Rosencranz, he

was not going to let anyone scream such things to him in front of his house so he turned to

Freeman and stated, "exactly who do you think you are you piece of shit?"  (Id. at 81-82).

7

Freeman then came rushing up to the plaintiff with his hands balled up into fists, and said "come on, come on. You want to go?" (<u>Id.</u> at 82).  Next, Freeman proceeded to "chest bump" Rosencranz, which caused the plaintiff to fall back. (<u>Id.</u>).  After Freeman chest bumped Rosencranz a second time, Rosencranz turned to Freeman and asked him, "are you out of your mind?" (<u>Id.</u> at 82, 85; DF ¶ 55).  He then turned away from the defendant in order to go back into the house, but Freeman came up behind Rosencranz, grabbed him, and slammed him into Nil's parked car. (Def. Ex. A at 85; DF ¶¶ 55-56).

At that point, a second police officer, Officer Hickey,[3] came over and assisted Freeman in pinning Rosencranz to the car. (Def. Ex. A at 85).  While Rosencranz was pinned to the car, Officer Hickey kicked the plaintiff in the leg. (<u>Id.</u> at 86).  At some point, both officers picked the plaintiff up by the shoulders, dragged him down the street, and threw him onto one of the police vehicles. (<u>Id.</u> at 87).  They also went through the pockets of Rosencranz's pants before pulling the plaintiff's pants all the way down as he stood in the middle of the street. (<u>Id.</u> at 87-88). Rosencranz admits that at some point during these events, he called Freeman, and probably Officer Hickey, "a fucking asshole." (<u>Id.</u> at 91).

The officers put Rosencranz into the back of Officer McCarthy's cruiser and drove him to the Winthrop police station. (<u>Id.</u> at 88).  As he was being transported, Rosencranz heard Freeman yelling into his radio, "this one's mine, this one's mine." (<u>Id.</u>). He also realized that one of his shoes was missing. (<u>Id.</u>).  Thus, Rosencranz arrived at the police station wearing only one shoe. (<u>Id.</u>).

---

[3] There is no dispute that Officer Hickey is not the same individual as Sergeant Hickey, the officer who spoke with Rosencranz on the telephone earlier that day. (<u>See</u> DF ¶ 37).

After Rosencranz was taken inside the police station, Officer McCarthy spoke to him briefly.  (Id. at 91; PF ¶ 45).  According to Rosencranz, Officer McCarthy emphasized that his statements were "off the record."  (Id.).  He then proceeded to tell the plaintiff that "this is the most fucked up thing I've seen in 15 years . . . here."  (Def. Ex. A at 91).  Additionally, Officer McCarthy told the plaintiff that Rosencranz had not done anything, and he described Freeman's actions as "out of control."  (Id.).  Nevertheless, Rosencranz was detained and placed in a cell across from Nil.  (DF ¶ 63).

Additional factual details are described below to the extent they are relevant to this court's analysis.

## IV. ANALYSIS

### A.    Summary Judgment Standard of Review

Both of the parties have moved for summary judgment, pursuant to Fed. R. Civ. P. 56, with respect to all of Rosencranz's claims against Freeman.  "The role of summary judgment is 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  PC Interiors, Ltd. v. J. Tucci Constr. Co., 794 F. Supp. 2d 274, 275 (D. Mass. 2011) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)) (additional citations omitted).  The burden is upon the moving party to show, based upon the discovery and disclosure materials on file, and any affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'"  Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48

(1st Cir. 1990)).  "A fact is 'material' only if it possesses the capacity to sway the outcome of the litigation under the applicable law."  Id. (quotations, punctuation and citations omitted).

"Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue."  PC Interiors, Ltd., 794 F. Supp. 2d at 275.  The opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts.  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841-42 (1st Cir. 1993).  Accordingly, "the nonmoving party 'may not rest upon mere allegation or denials of his pleading[,]'" but must set forth specific facts showing that there is a genuine issue for trial.  Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986)).

"Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed."  Adria Int'l Group, Inc. v. Ferre Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001).  "'When facing cross-motions for summary judgment, a court must rule on each motion independently, deciding in each instance whether the moving party has met its burden under Rule 56.'"  Peck v. City of Boston, 750 F. Supp. 2d 308, 312 (D. Mass. 2010) (quoting Dan Barclay, Inc. v. Stewart & Stevenson Servs., Inc., 761 F. Supp. 194, 197-98 (D. Mass. 1991)).

### B.      Timeliness of the Plaintiff's Motion

The defendant contends, as a threshold matter, that Rosencranz's cross-motion for summary judgment should be denied as untimely because it was not filed until three weeks after the deadline for filing summary judgment motions had passed.  (Def. Opp. Mem. (Docket

No. 100) at 1-2).  As the defendant argues, the operative schedule in this case called for such

motions to be filed by July 11, 2016, but the plaintiff did not file his cross-motion until August

1, 2016, the date when his opposition to Freeman's motion was due.  (See Docket Nos. 86, 96,

99).  Nevertheless, this court finds that Rosencranz's actions were not inappropriate, and that

his motion for summary judgment should not be denied on this basis.

Although this court set a deadline of July 11, 2016 for the parties to file any motions for

summary judgment, this court did not specifically preclude the parties from filing cross-

motions in response to an initial summary judgment motion.  Moreover, the plaintiff's motion

is based on the same general set of facts, and addresses the same legal issues, that Freeman

has relied on in his moving papers.  In any event, this court finds that the critical facts relating

to Rosencranz's claims are in dispute and must be resolved at trial.  Therefore, the outcome of

summary judgment would be the same whether or not this court were to address

Rosencranz's cross-motion on the merits.  For all these reasons, this court declines to deny the

plaintiff's cross-motion on the grounds that it is untimely.

### C.   Count I: Claims Against Freeman for Civil Rights Violations Under Section 1983

In Count I his Complaint, Rosencranz has asserted civil rights claims against Freeman,

pursuant to Section 1983, for violations of his constitutional rights to remain free from false

arrest and excessive force.  Freeman argues that he is protected from liability under the

doctrine of qualified immunity, and that summary judgment should be allowed in his favor.

The plaintiff disputes that qualified immunity applies, and argues that he is entitled to

judgment as a matter of law on these claims.  For the reasons that follow, this court finds that

disputed issues of fact preclude summary judgment for either party with respect to

Rosencranz's claims under Section 1983.

### i.      Qualified Immunity – In General

"The doctrine of qualified immunity protects government officials 'from liability for civil

damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known.'"  Pearson v. Callahan,

555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009) (quoting Harlow v. Fitzgerald,

457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982)).  "Qualified immunity

balances two important interests – the need to hold public officials accountable when they

exercise power irresponsibly and the need to shield officials from harassment, distraction, and

liability when they perform their duties reasonably.  The protection of qualified immunity

applies regardless of whether the government official's error is a mistake of law, a mistake of

fact, or a mistake based on mixed questions of law and fact."  Id. (quotations and citations

omitted).

The determination whether an official is entitled to qualified immunity requires an

assessment as to whether the facts alleged or shown by the plaintiff "make out a violation of a

constitutional right" and, if so, "whether the right at issue was clearly established at the time

of defendant's alleged misconduct."  Id. at 232, 129 S. Ct. at 816 (quotations and citations

omitted).  "[T]he second, 'clearly established' step of the qualified immunity analysis . . . in

turn, has two aspects."  Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009).  As the First

Circuit has described:

> One aspect of the analysis focuses on the clarity of the law at the time of
> the alleged civil rights violation.  To overcome qualified immunity, the

contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  The other aspect focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights.  Indeed, it is important to emphasize that this inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition.

Id. (quotations, citations and alterations omitted).  In the instant case, Freeman has focused only on the first step of the qualified immunity analysis.  Thus, he argues that he is entitled to summary judgment because his conduct was proper, and did not constitute a violation of the plaintiff's constitutional rights.

### ii.    Claim for False Arrest

Rosencranz claims that Freeman deprived him of his constitutional rights under Section 1983 by arresting him in front of his home without probable cause.  Freeman contends that he is entitled to qualified immunity with respect to this claim because he had probable cause to arrest the plaintiff for both disorderly conduct and assault and battery.  (Def. Mem. (Docket No. 93) at 8-11).  For his part, Rosencranz argues that he engaged in no conduct that would have justified the arrest, and that summary judgment should be entered in his favor on this claim.  (See Pl. Opp. Mem. (Docket No. 98) at 6-12).  This court finds that the relevant facts are in dispute, and that the question of probable cause should be resolved at trial.

### Probable Cause

"The Fourth Amendment requires arrests be based on probable cause."  Sietins v. Joseph, 238 F. Supp. 2d 366, 375 (D. Mass. 2003).  "The probable cause standard is a 'relatively low threshold' for police officers to establish."  Id. (quoting White v. Town of Marblehead, 989 F. Supp. 345, 349 (D. Mass. 1997)).  It is met "when police officers, relying on reasonably

13

trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime." United States v. Jones, 432 F.3d 34, 41 (1st Cir. 2005) (quoting United States v. Young, 105 F.3d 1, 6 (1st Cir. 1997)).

The probable cause analysis does not involve consideration of "'the officer's state of mind at the time the challenged action was taken[,]'" but rather "involves 'an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time[.]'" Sietins, 238 F. Supp. 2d at 375 (quoting Alexis v. McDonald's Rests. of Mass., Inc., 67 F.3d 341, 349 (1st Cir. 1995)). Thus, "the existence of probable cause (and, in turn, the validity of an ensuing arrest) is guaged by an objective standard; as long as the circumstances surrounding the event warrant the officer's reasonable belief that the action taken is appropriate, the arrest is justified." Nolan v. Krajcik, 384 F. Supp. 2d 447, 460 (D. Mass. 2005) (quoting Logue v. Dore, 103 F.3d 1040, 1044 (1st Cir. 1997)). However, "the probable cause inquiry is not necessarily based upon the offense actually invoked by the arresting officer but upon whether the facts known at the time of the arrest objectively provided probable cause to arrest." Jones, 432 F.3d at 41. "In other words, 'probable cause need only exist as to *any* offense that *could be* charged under the circumstance.'" LaFrenier v. Kinirey, 478 F. Supp. 2d 126, 136 (D. Mass. 2007) (quoting United States v. Bizier, 111 F.3d 214, 219 (1st Cir. 1997)) (emphasis in original), aff'd, 550 F.3d 166 (1st Cir. 2008. "If reasonable grounds to arrest exist, probable cause is established and there is no further duty to investigate." Sietins, 238 F. Supp. 2d at 375 (quoting White, 989 F. Supp. at 349).

**Probable Cause to Arrest for Disorderly Conduct**

Freeman argues that he had probable cause to arrest Rosencranz for disorderly conduct.  Under the Massachusetts disorderly conduct statute, Mass. Gen. Laws ch. 272, § 53, a person is deemed disorderly

> "if, with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof; he: (a) engages in fighting or threatening, or in violent or tumultuous behavior; or (b) makes unreasonable noise or offensively coarse utterance, gesture or display, or addresses abusive language to any person present; or (c) creates a hazardous or physically offensive condition by an act which serves no legitimate purpose of the actor."

Commonwealth v. LePore, 40 Mass. App. Ct. 543, 545-46, 666 N.E. 2d 152, 155 (1996) (quoting Alegata v. Commonwealth, 353 Mass. 287, 304, 231 N.E. 2d 201 (1967)) (additional citation omitted).  However, it has long been held that "the use of offensive and abusive language[,]" without more, does not constitute disorderly conduct.  Commonwealth v. A Juvenile, 368 Mass. 580, 581, 334 N.E. 2d 617, 619 (1975).  Rather, "[t]o be disorderly, within the sense of the statute, the conduct must disturb through acts other than speech; neither a provocative nor a foul mouth transgresses the statute." LePore, 40 Mass. App. Ct. at 546, 666 N.E. 2d at 155.

In defining conduct which violates Mass. Gen. Laws ch. 272, § 53, the Massachusetts Supreme Judicial Court ("SJC") has adopted parts of the Am. Law Inst., Model Penal Code, § 250.2 (Proposed Official Draft, 1962).  See A Juvenile, 368 Mass. at 596-97, 334 N.E. 2d at 627-28.  Thus, a person who "engages in fighting or threatening, or in violent or tumultuous behavior; or . . . creates a hazardous or physically offensive condition by any act which serves

15

no legitimate purpose of the actor" may be liable for disorderly conduct under Massachusetts

law.  Id. (internal quotations omitted).  As the SJC has explained:

> the type of conduct which the disorderly person provision of § 53 reaches
> is that conduct which by its very nature involves the use of physical force
> or violence or any threat to use such force or violence if that threat is
> objectively possible of immediate execution .... Also covered is
> "tumultuous behavior," which while perhaps not physically violent, may
> nevertheless be characterized as involving riotous commotion and
> excessively unreasonable noise so as to constitute a public nuisance.
> Conduct which creates a condition of physical menace to others is also
> reached ....

Id. at 596-97, 334 N.E. 2d at 628.  Consequently, in order to show that there was probable

cause to arrest Rosencranz in the instant case, Freeman "must establish that an objectively

reasonable police officer observing [the plaintiff's] words and gestures would have believed

that, under the circumstances, [his] conduct was physically threatening or sufficiently riotous

or noisy to constitute a public nuisance."  Nolan, 384 F. Supp.2d at 461.

This court finds that the question whether Freeman had probable cause to arrest

Rosencranz for disorderly conduct is best answered by a jury at trial.  A reasonable jury

viewing the facts presented on summary judgment could determine that the plaintiff did

nothing to warrant his arrest.  Thus, a jury could find that the plaintiff was cleaning his yard

and speaking courteously to the officers at the time of the events at issue, and that Freeman

was the only aggressor involved in the parties' encounter.  In particular, a jury could conclude,

based on the evidence relied on by Rosencranz, that the plaintiff did not spill beer on the

defendant, and that even if he did, it was nothing more than an accident for which Rosencranz

apologized.  On the other hand, a factfinder could reasonably determine that Rosencranz

acted provocatively by repeatedly insisting that the Winthrop police officers apprise him of

their efforts to obtain a search warrant for Nil's home and car, by questioning Freeman's professionalism, and by pouring beer on the defendant's feet.  In addition, a jury could find that Rosencranz was speaking sarcastically when he apologized to Freeman, and that a reasonable officer in Freeman's position would have viewed the combination of Rosencranz's speech and actions as both a deliberate challenge to Freeman's authority and a threat to use physical force against him.  Accordingly, a reasonable jury could find that there was probable cause to arrest the plaintiff for engaging in disorderly conduct.

The plaintiff argues that there is no evidence in the record to support a finding that he dripped or poured beer on the defendant, and that the absence of such evidence defeats Freeman's reliance on the disorderly conduct statute.  (See Pl. Opp. Mem. at 2, 8-9).  However, the plaintiff's argument is undermined by his own exhibits, which contain evidence to the contrary.  Specifically, Rosencranz has submitted testimony in which Freeman stated that the plaintiff poured beer on his feet.  (Pl. Ex. A at 56-57 of 99).  In any event, a rational factfinder could reasonably conclude that Rosencranz would not have called Freeman's attention to the beer, or felt the need to apologize for spilling it, unless he had actually spilled liquid on the defendant.  Accordingly, the record on summary judgment establishes that the critical facts are in dispute and that the issue of probable cause must await resolution at trial.

### Probable Cause to Arrest for Assault and Battery

The evidence also raises a question of fact as to whether Freeman had probable cause to arrest the plaintiff for committing an assault and battery against him.  "An assault and battery is the intentional and unjustified use of force upon the person of another, however slight, or the intentional commission of a wanton or reckless act (something more than gross

17

negligence) causing physical or bodily injury to another." Commonwealth v. Correia, 50 Mass. App. Ct. 455, 456, 737 N.E. 2d 1264, 1265-66 (2000) (quotations and citations omitted). Furthermore, "[u]nder Mass. Gen. Laws ch. 265, § 13D, a person commits the offense of assault and battery on a police officer if he engages in 'purposeful and unwelcomed contact with a person the defendant knows to be a law enforcement officer actually engaged in the performance of official duties.'" LaFrenier, 478 F. Supp. 2d at 136 (quoting United States v. Santos, 363 F.3d 19, 23 (1st Cir. 2004)) (additional citation omitted). "Neither violence nor the use of force is an essential element of the offense." Id. Moreover, "[t]he offensive touching may be direct, as by striking another, or it may be indirect, as by setting in motion some force or instrumentality with the intent to cause injury." Commonwealth v. Cohen, 55 Mass. App. Ct. 358, 359, 771 N.E. 2d 176, 178 (2002) (quoting Commonwealth v. Dixon, 34 Mass. App. Ct. 653, 654, 614 N.E. 2d 1027 (1993)). Ultimately, "[t]he affront to the victim's personal integrity is what makes the touching offensive." Id. (quoting Commonwealth v. Burke, 390 Mass. 480, 483, 457 N.E. 2d 622 (1983)).

The critical facts relating to this issue are in dispute. If a jury were to credit Freeman's testimony and find that Rosencranz poured beer on the officer's feet, it could easily conclude that a reasonable officer in Freeman's position had probable cause to arrest the plaintiff for assault and battery. See id. at 359-60, 771 N.E. 2d at 178 (finding that "intentionally spitting on someone is an indirect touching that is repulsive, physically offensive, and violates the victim's personal integrity[,]" and "holding that an intentional and unconsented spitting on another constitutes a criminal battery"). If, however, a jury were to credit Rosencranz's version of events, and find that no beer spilled on Freeman and that the plaintiff was too far

18

away from the defendant to cause any offensive touching, the jury could just as easily

determine that there was no reasonable basis for believing that Rosencranz had committed a

crime or that an arrest was justified.  Therefore, neither party has shown that he is entitled to

summary judgment on Rosencranz's claim for false arrest.

       **iii.**    **Claim of Excessive Force**

The plaintiff also claims, in Count I of his Complaint, that Freeman violated his

constitutional rights through the use of excessive force.  The defendant contends that he is

entitled to qualified immunity with respect to this claim because he only used the amount of

force necessary to effectuate a lawful arrest.  (<u>See</u> Def. Mem. at 12-13).  In other words,

Freeman argues that his use of force was reasonable and did not violate the Constitution.

Rosencranz, on the other hand, asserts that he is entitled to judgment as a matter of law on

this claim because, even if he had arguably poured beer on the defendant's feet, there was no

justification for the defendant's actions in chest bumping and otherwise assaulting him.  (Pl.

Opp. Mem. at 6).  This court finds that disputed issues of material fact preclude summary

judgment for either party on this claim as well.

"Where an excessive force claim arises in the context of an arrest, the claim 'must be

analyzed in light of the Fourth Amendment's prohibition of unreasonable searches and

seizures.'"  <u>LaFrenier</u>, 478 F. Supp. 2d at 137-38 (quoting <u>Gaudreault v. Municipality of Salem</u>,

923 F.2d 203, 205 (1st Cir. 1990)).  Because "Fourth Amendment jurisprudence has long

recognized that the right to make an arrest . . . necessarily carries with it the right to use some

degree of physical coercion or threat thereof to effect it[,]" a determination as to "whether the

force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires

a careful balancing of the nature and quality of the intrusion on the individual's Fourth

Amendment interests against the countervailing governmental interests at stake.'" <u>Graham v.</u>

<u>Connor</u>, 490 U.S. 386, 396, 109 S. Ct. 1865, 1871-72, 104 L. Ed. 2d 443 (1989) (internal

quotations and citations omitted).  Accordingly, the relevant inquiry in evaluating an excessive

force claim "is whether the force used was 'objectively reasonable' under all the

circumstances; that is, whether it was consistent with the amount of force that a reasonable

police officer would think necessary to bring the arrestee into custody." <u>Gaudreault</u>, 923 F.2d

at 205.

In applying the test for reasonableness under the Fourth Amendment, it is important to

remain mindful that "[t]he 'reasonableness' of a particular use of force must be judged from

the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

hindsight." <u>Graham</u>, 490 U.S. at 396, 109 S. Ct. at 1872.  As the Supreme Court has cautioned,

> [n]ot every push or shove, even if it may later seem unnecessary in the
> peace of a judge's chambers, violates the Fourth Amendment.  The
> calculus of reasonableness must embody allowance for the fact that
> police officers are often forced to make split-second judgments – in
> circumstances that are tense, uncertain, and rapidly evolving – about the
> amount of force that is necessary in a particular situation.

<u>Id.</u> at 396-97, 109 S. Ct. at 1872 (internal quotations and citation omitted).

In the instant case, the question whether Freeman used reasonable force under the

circumstances cannot be resolved on summary judgment.  Under the plaintiff's version of

events, Freeman's use of force was entirely unjustified.  According to the plaintiff, he did not

engage in any conduct that would have supported an arrest, much less warranted a need to

chest bump the plaintiff, slam him into Nil's car, and pull down his pants in the middle of the

street.  Even if it were found that Rosencranz did pour beer on Freeman's feet, a jury could

reasonably conclude that the level of force was unreasonable.  The plaintiff has presented

evidence showing that he apologized to Freeman, and there are no facts to indicate that

Rosencranz attempted to harm Freeman or to resist the arrest.  See Raiche v. Pietroski, 623

F.3d 30, 37 (1st Cir. 2010) (evidence that officer engaged in unprovoked attack on individual

who presented no threat, made no effort to resist arrest, and merely committed motor vehicle

violation supported conclusion that use of force was unreasonable).  Thus, a factfinder could

conclude that the defendant's use of force was excessive and violated the plaintiff's

constitutional rights.

Nevertheless, this court cannot find that the level of force used by Freeman was

unreasonable as a matter of law.  It is undisputed that Freeman's use of force occurred after

Rosencranz had spilled at least some beer and called Freeman a "piece of shit."  (See Def. Ex. A

at 79-82).  Assuming his version of the evidence is correct, and that Rosencranz actually

poured beer on his feet, it would not have been unreasonable for Freeman to conclude from

the combination of Rosencranz's words and actions that the plaintiff posed an immediate

threat to himself and the other officers.  See Graham, 490 U.S. at 396, 109 S. Ct. at 1872

(explaining that determination as to whether force used to carry out an arrest was reasonable

requires attention to facts and circumstances of the particular case, including but not limited

to, "whether the suspect poses an immediate threat to the safety of the officers or others").

Furthermore, it is undisputed that Rosencranz persisted in challenging Freeman by calling him

"a fucking asshole," and there is no evidence that Rosencranz suffered any physical injuries as

a result of Freeman's conduct.  (See Def. Ex. A at 91).  Consequently, a rational jury could

conclude that the actual level of force used was minimal, and involved only so much physical

contact as was reasonably necessary to subdue the plaintiff and carry out his arrest.   See

LaFrenier, 478 F. Supp. 2d at 139 (finding that plaintiff's "allegations of injury, unsupported by

medical records or other evidence," were insufficient to avoid summary judgment in favor of

police officers with respect to excessive force claim where evidence established that

substantial force was necessary to subdue plaintiff).

Because a rational jury could find in favor of either party on Rosencranz's claims for

false arrest and excessive force under Section 1983, the question of qualified immunity cannot

be resolved at this juncture.   Accordingly, both parties' motions will be denied with respect to

Count I of the Complaint.

D.        **Count II: Claims Against Freeman Under the MCRA**

In Count II, Rosencranz claims that Freeman's conduct in unlawfully arresting him and

using excessive force against him violated his rights under the MCRA.   Freeman contends that

qualified immunity protects him from any liability on this claim, and that summary judgment is

also warranted in his favor because the record contains no evidence showing that he engaged

in threats, intimidation or coercion, as required to support a claim under the MCRA.   (Def.

Mem. at 6-15).   Rosencranz argues that this claim must be resolved in his favor because there

was no probable cause to arrest him.   (Pl. Opp. Mem. at 12-13).   This court finds that disputed

issues of fact preclude summary judgment for either party on Count II of the Complaint.

To prevail on a claim under the MCRA,[4] "a plaintiff must show that (1) his exercise or

enjoyment of rights secured by the constitution or laws of either the United States or the

---

[4] The MCRA, Mass. Gen. Laws ch. 12, § 11H, provides in relevant part: "Whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other

Commonwealth of Massachusetts (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by threats, intimidation or coercion." Farrah ex rel. Estate of Santana v. Gondella, 725 F. Supp. 2d 238, 247 (D. Mass. 2010) (footnote added). "The purpose of the MCRA is to provide under state law a remedy 'coextensive with 42 U.S.C. § 1983, except that the Federal statute requires State action whereas its State counterpart does not.'" Id. (quoting Batchelder v. Allied Stores Corp., 393 Mass. 819, 822-23, 473 N.E. 2d 1128 (1985)). Furthermore, under the MCRA, but not Section 1983, the plaintiff must identify a federal or state right that has been "interfered with by threats, intimidation, or coercion." Flesner v. Tech. Commc'ns Corp., 410 Mass. 805, 818, 575 N.E. 2d 1107, 1115 (1991).

"[T]he Supreme Judicial Court of Massachusetts has held that MCRA claims are subject to the same standard of immunity for police officers that is used for claims asserted under § 1983." Raiche, 623 F.3d at 40. Thus, the qualified immunity analysis that applies to Rosencranz's claims under Section 1983 is also applicable to his claims under the MCRA. See id. ("Because we have already determined that [the defendant] is not protected by qualified immunity with respect to the § 1983 excessive force claim, we likewise conclude that he is not entitled to qualified immunity against the MCRA claim alleging excessive force"). For the reasons detailed above, the existence of disputed facts precludes a determination as to

---

person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, the attorney general may bring a civil action for injunctive or other appropriate equitable relief in order to protect the peaceable exercise or enjoyment of the right or rights secured." Mass. Gen. Laws ch. 12, § 11I authorizes civil actions by any person who has suffered the interference or attempted interference of the rights described in § 11H.

whether Freeman violated the plaintiff's constitutional rights.  Therefore, the question of

qualified immunity cannot be resolved on summary judgment.

Nevertheless, Freeman argues that he is entitled to summary judgment on the MCRA

claim because there is no evidence that the defendant engaged in threats, intimidation or

coercion.  (Def. Mem. at 14).  This court finds that the material facts relevant to this issue are

disputed as well.

The MCRA "is 'explicitly limited' to situations 'where the derogation of secured rights

occurs by threats, intimidation or coercion' involving a specific threat of harm 'directed toward

a particular individual or class of persons.'"  Farrah ex rel. Estate of Santana, 725 F. Supp. 2d at

247 (quoting Bally v. Northeastern Univ., 403 Mass. 713, 718-19, 532 N.E. 2d 49 (1989)).  As

defined by the SJC,

> "[a] 'threat' … involves the intentional exertion of pressure to make
> another fearful or apprehensive of injury or harm.  'Intimidation'
> involves putting in fear for the purpose of compelling or deterring
> conduct … ['Coercion' involves] the application to another of such force,
> either physical or moral, as to constrain [a person] to do against his will
> something he would not otherwise have done."

Id. (quoting Planned Parenthood League of Mass., Inc. v. Blake, 417 Mass. 467, 474, 631 N.E.

2d 985 (1994)) (alterations in original).

Ordinarily, "[a] direct violation of a person's rights does not by itself involve threats,

intimidation, or coercion."  Id. at 248 (quoting Longval v. Comm'r of Corr., 404 Mass. 325, 333,

535 N.E. 2d 588 (1989)) (additional citation omitted).  Therefore, Freeman's purported use of

excessive force, without more, is insufficient to support Rosencranz's claim against him under

the MCRA.  See Orwat v. Maloney, 360 F. Supp. 2d 146, 164 (D. Mass. 2005) (finding that while

defendant's purported use of excessive force constitutes a direct violation of plaintiff's

constitutional rights, it "does not by itself involve threats, intimidation, or coercion and thus does not implicate the [MCRA]" (quoting <u>Longval</u>, 404 Mass. at 333, 535 N.E. 2d at 593)).  On the other hand, "[a]n arrest without probable cause has been found to constitute coercion within the meaning of the MCRA."  <u>Nuon v. City of Lowell</u>, 768 F. Supp. 2d 323, 335 n.8 (D. Mass. 2011), and cases cited.  Thus, if Rosencranz can prove that his arrest was unlawful, he may be able to prevail on his claim under the statute.  At this stage, however, the question whether Freeman had probable cause to arrest the plaintiff remains in dispute.  Therefore, the issue whether Freeman violated the plaintiff's constitutional rights through the use of coercion must be addressed at trial.

**E.      Claim III: Claim of False Imprisonment**

The plaintiff's next claim, which is set forth in Count III of his Complaint, consists of a claim for false imprisonment.  Under Massachusetts law, "[f]alse imprisonment is the 'intentional and unlawful confinement of a person, either directly or indirectly, of which the person confined is conscious or is harmed by such confinement.'"  <u>Goddard v. Kelley</u>, 629 F. Supp. 2d 115, 129 (D. Mass. 2009) (quoting <u>Jonielunas v. City of Worcester Police Dep't</u>, 338 F. Supp. 2d 173, 177 (D. Mass. 2004)).  In this case, Rosencranz's claim of false imprisonment is premised upon his alleged arrest and confinement without probable cause.

"A police officer is liable for false imprisonment if he arrests, or causes the arrest, of the plaintiff, without probable cause."  <u>Id.</u>  As a result, the standard for evaluating a claim of false imprisonment "is essentially the same as the Fourth Amendment standard for unlawful arrest."  <u>Id.</u>  Because the facts concerning the lawfulness of the plaintiff's arrest are disputed, the parties' motions for summary judgment must be denied with respect to Count III.

F.      **Count IV: Claim for Assault and Battery**

The parties have also cross-moved for summary judgment on Rosencranz's common law claim against Freeman for assault and battery, which is asserted in Count IV of the Complaint.  As described above, "[a]ssault and battery is the 'intentional and unjustified use of force upon the person of another, however slight, or the intentional doing of a wanton or grossly negligent act causing personal injury to another.'"  Id. (quoting Commonwealth v. McCan, 277 Mass. 199, 203, 178 N.E. 633 (1931)).  Under Massachusetts law, "[a]n officer authorized to make an arrest may use such force as is reasonably necessary to effect the arrest."  Id. (quoting Sietens, 238 F. Supp. 2d at 380).  Where, as here, "a plaintiff alleges both a § 1983 excessive force claim and [a] common law claim[ ] for assault and battery, [the] determination of reasonableness of the force used under § 1983 controls [the] determination of reasonableness of the force used under the common law assault and battery claim[ ]."  Raiche, 623 F.3d at 40.  In this case, the relevant facts relating to the reasonableness of the force used by Freeman are in dispute.  Therefore, both motions for summary judgment must be denied with respect to Count IV.

Freeman's argument that qualified immunity protects him from liability on Rosencranz's claim for assault and battery does not alter this court's conclusion that he is not entitled to judgment as a matter of law.  (See Def. Mem. at 12).  As an initial matter, "Massachusetts law is unsettled regarding the existence of a state-law concept analogous to federal qualified immunity."  Raiche, 623 F.3d at 40.  Moreover, even if this court were to assume that the doctrine of qualified immunity applies, Freeman has not shown that he is

entitled to qualified immunity at the summary judgment stage.  Therefore, he has not shown

that he is entitled to judgment as a matter of law on this basis.

G.      **Count V: Claim for Intentional Infliction of Emotional Distress**

Rosencranz's final cause of action, which is set forth in Count V of the Complaint,

consists of a claim for the intentional infliction of emotional distress.  Again, both parties have

moved for summary judgment on this claim.  For the reasons that follow, this court finds that

Freeman's motion must be allowed with respect to Count V.

In order to prevail on a claim for intentional infliction of emotional distress, the plaintiff

"must prove '(1) that the defendant intended to cause, or should have known that his conduct

would cause, emotional distress; (2) that the defendant's conduct was extreme and

outrageous; (3) that the defendant's conduct caused the plaintiff's distress; and (4) that the

plaintiff suffered severe distress.'"  Sietins, 238 F. Supp. 2d at 379 (quoting Howcroft v. City of

Peabody, 51 Mass. App. Ct. 573, 596, 747 N.E. 2d 729, 747 (2001)) (additional citation

omitted).  In the instant case, Freeman argues that the evidentiary record is insufficient to

satisfy the second and fourth elements of Rosencranz's claim.  (Def. Mem. at 15-18).  Because

Rosencranz has failed to present any facts showing that his encounter with Freeman caused

him to suffer severe emotional distress, this court finds that the defendant is entitled to

judgment as a matter of law.[5]

For purposes of an intentional infliction claim, "severe" emotional distress "means the

kind of distress that no reasonable man could be expected to endure, as opposed to mere

---

[5] In light of this court's conclusion that Rosencranz has not presented sufficient evidence to satisfy the
fourth element of his claim for intentional infliction of emotional distress, it is not necessary to
determine whether Freeman's conduct could be considered extreme and outrageous.

emotional responses including anger, sadness, anxiety, and distress, which, though blameworthy, are often not legally compensable." <u>Kennedy v. Town of Billerica</u>, 617 F.3d 520, 530 (1st Cir. 2010) (internal quotations and citations omitted).  Although medical or psychiatric evidence is not necessary to satisfy this standard, there must be some evidence by which a jury could reasonably infer that the plaintiff suffered severe distress.  <u>See Poy v. Boutselis</u>, 352 F.3d 479, 485-86 (1st Cir. 2003) (despite the fact that plaintiff presented no medical or psychiatric evidence, jury could reasonably infer a condition of severe emotional distress based on severity of attack and resulting injuries).  Here, the plaintiff has submitted no such evidence.  In particular, there is no evidence that Rosencranz suffered any physical harm or sought any treatment or medical care following his release from police custody.  Nor has the plaintiff presented any facts showing that he experienced emotional distress, much less severe emotional distress, as a result of the alleged attack.  Moreover, during a hearing before the court in this case, Rosencranz conceded that he was alleging nothing more than "garden variety" emotional distress, and that he had no intent to call any medical or mental health providers as witnesses at trial, or to introduce any medical or mental health records into evidence.  (<u>See</u> Docket No. 65 ¶ 1.a.).  Therefore, Freeman's motion for summary judgment is allowed with respect to Count V.

## IV.  <u>CONCLUSION</u>

For all the reasons detailed herein, "Defendant James Freeman's Motion for Summary Judgment" (Docket No. 92) is ALLOWED IN PART and DENIED IN PART.  Specifically, the defendant is entitled to summary judgment with respect to Rosencranz's claim for intentional

infliction of emotional distress, but his motion is otherwise denied.  The plaintiff's "Cross-

Motion for Summary Judgment" (Docket No. 99) is DENIED.

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge